1
2
3
4
5
6
7
8            UNITED STATES DISTRICT COURT
9           NORTHERN DISTRICT OF CALIFORNIA
10

11    RODNEY WILLIAMS,
                    Petitioner,                    Case No.  18-04859 EJD (PR)
12
13          v.                                     **ORDER DENYING PETITION FOR
                                                   WRIT OF HABEAS CORPUS;
14                                                 DENYING CERTIFICATE OF
       ROBERT W. FOX, Warden,                      APPEALABILITY; DIRECTIONS
15                                                 TO CLERK**
                    Respondent.
16

17          Petitioner filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254

18    challenging his state conviction.  The Court found the petition, Dkt. No. 1, "Petition",

19    stated cognizable claims which merited an answer from Respondent.  Dkt. No. 11.

20    Respondent filed an answer on the merits.  Dkt. No. 15, "Answer."  Despite a notice and

21    opportunity to do so, Petitioner failed to file a traverse.  See generally, Dkt.  For the

22    reasons set forth below, the Petition for a Writ of Habeas Corpus is **DENIED**.

23                              **I.  BACKGROUND**

24          On March 21, 2016, Petitioner was found guilty by a jury in San Mateo County

25    Superior Court ("trial court") of second-degree murder, with the personal use of a deadly

26    and dangerous weapon, and the infliction of great bodily harm upon his victim.  See Pet. at

27    1-2.  Petitioner was sentenced to a term of 31 years to life in prison.  See id. at 1.

28

On December 12, 2017, the California Court of Appeal ("state appellate court")

affirmed the judgment in a reasoned opinion. See Ans., Ex. F; see also People v. Williams,

No. A148797, 2017 WL 6334240 (Cal. Ct. App. Dec. 12, 2017). The California Supreme

Court summarily denied a petition for review on March 21, 2018. See Pet., Ex. A.

Petitioner filed the instant habeas petition on August 10, 2018.

## II. STATEMENT OF FACTS

The following facts are taken from the opinion of the state appellate court on direct

appeal:

> The prosecution charged Williams with murder (§ 187, subd.
> (a)) and alleged he personally used a deadly and dangerous
> weapon (§ 12022, subd. (b)(1)) and personally inflicted great
> bodily injury (§ 1203.075, subd. (a)). The operative information
> alleged Williams had two prior strike convictions (§ 1170.12,
> subd. (c)(2)).

> **Prosecution Evidence**
> Williams worked with Neil Lewis. In early June 2015, Lewis
> was shot and his left leg was "completely shattered." After
> about two weeks, Lewis returned to work, but he walked with a
> limp and "it was hard for him to put pressure on" his left leg.
> Lewis was "in constant pain" after the shooting.

> On July 7, 2015, Victor A., his wife, and his daughter arrived at
> an office building in Burlingame. Before going inside, Victor
> smoked a cigarette behind the building. As Victor smoked, his
> wife called to him, saying two people were fighting. Victor
> came to the lobby and saw two men fighting in front of the
> building. Victor's daughter also witnessed the fight. A taller,
> heavier man—later identified as Williams—was "dominating"
> Lewis, "trying to force him to the ground." With his palms
> facing out, Lewis tried, unsuccessfully, "to defend himself."
> Williams punched Lewis, who tried to "cover his face to not get
> ... hit." Williams forcefully lifted Lewis in the air and threw
> him, causing Lewis to fall to the ground. Then Williams hit
> Lewis four or five times.

> Lewis did not punch Williams, and he did not put his hands
> around Williams's neck. Instead, Lewis tried to back away from
> Williams, to avoid getting hit. Eventually, Lewis was unable to
> get up. Williams got into a car and drove to a nearby parking
> lot, where he told a man he had been "jumped" by "some of his
> co-workers." Williams's T-shirt was bloody, and he had blood
> on his hand. The man asked Williams whether he needed an
> ambulance or the police, and William[s] said "no." Williams
> went into the bathroom, took off his T-shirt, and wiped off the
> blood. The man could see Williams's face and torso; there were
> no cuts, injuries, scratches, or blood.

Shortly after Williams left, Lewis lost consciousness. He died from "complications of multiple sharp force injuries." Lewis had "seven stab wounds and four cuts." One of the wounds—which was four inches deep—entered Lewis's chest and penetrated his left lung. Another "extremely serious" wound penetrated Lewis's heart and by itself would have been fatal. Another wound would have disabled the use of Lewis's hand "very significantly" and was consistent with Lewis "grasp[ing] a knife blade in trying to defend [him]self against it." The majority of Williams's wounds were consistent with defensive wounds.

Williams was arrested in Sacramento in late July 2015. When he was arrested, Williams did not have any injuries or scars.

**Defense Evidence**

Williams testified that he began working with Lewis in July 2014. They had a cordial relationship. In 2015, Williams was dating two women, including K.M., who had previously worked with Lewis. In May 2015, Williams was having "trust issues" with K.M. and saw "a number calling her phone consistently." Williams learned it was Lewis who had been calling K.M., so he asked Lewis, "'What's going on here? Is there anything I need to know about?'" Lewis told Williams he was just checking in with K.M. A few days later, Williams sent Lewis a text saying "Bruh, I'm all ears" because Lewis had indicated he wanted to talk. The two men talked and Lewis assured Williams there was nothing to worry about. Williams felt the issue was resolved.

In June 2015, Williams learned Lewis had been shot. After Lewis returned to work, Williams approached him, to "see how he was doing." Lewis was sitting in the passenger seat of a car; the "driver had a gun on his lap." William[s] asked Lewis, "'How are you doing?'" Lewis responded by asking Williams if he still associated with a street gang called the 500 Boys. Williams said no, but he interpreted the question as an accusation that he "had some type of involvement with [Lewis's] shooting."

When Williams saw Lewis in early July 2015, Lewis was not friendly: he "turned up his lip ... like, I'm not cool." The two men got into a "kind of heated" argument. On July 7, 2015, Williams and Lewis worked together. At the end of the evening, when Williams said goodbye, Lewis "mugg[ed]" him, as if to tell Williams he was "not cool." The two men exchanged words, and Williams asked Lewis, "'You know, what is this going to come to? ... What is going to be the end of this?'" In response, Lewis said: "'Go around the corner and handle it now.'" Williams thought Lewis meant they "were going to go around the corner, maybe a fistfight, argue or something." Williams's "perception" of the comment was: "let's go around the corner and fight it out." Williams thought there "was going to be a fight."

Williams followed Lewis's car toward an office building in Burlingame. Lewis got out of the car "aggressively" and then "grabbed at his waist a little bit." Williams—who thought Lewis might have "had a weapon, a gun or something"—kept driving. As Williams drove, Lewis "threw something at the car." Williams stopped driving, got out of the car, and said, "'What's up?'" Lewis came toward Williams "at a fast pace, and he raised his hand," which held a knife. [FN 2.] Williams was scared.

> [FN 2: Over Williams's hearsay objection, the court allowed several prosecution witnesses to testify on rebuttal regarding statements Lewis made before the incident. Lewis's brother, and his best friend, testified Lewis did not carry a knife. The day before he died, Lewis told his best friend that he had "some problems with a guy at work" over a girl, and that the "guy called his phone a lot, ... threatening him," but that Lewis "wasn't worried about it." Lewis's girlfriend testified on rebuttal that Lewis said he had an issue "with a guy at work" and that when he returned to work after the shooting, the two had a confrontation and they had "squared up." Lewis called the guy a "fuckboy" and a "little, short, ugly guy." Lewis also said, "'I'll fuck his little ass up.'"]

Williams grabbed Lewis's "hand with the knife" and the two men began to "tussle." The knife fell to the ground and Williams and Lewis fought "over possession" of it. Williams picked up the knife, and Lewis "rushed back in at [him]," trying to swat the knife from Williams's hand. Then Lewis "wrapped his hands around [Williams's] neck and started to choke" him. At that point, Williams tried to stab Lewis's arm so Lewis would release the choke hold. When this was unsuccessful, Williams swung the knife wildly to "save" himself. Somehow, Lewis "ripped" the knife out of Williams's hand; then the knife "ended up ... in front of the building." The two men "pull[ed] at each other, trying to keep each other away from the knife."

Williams retrieved the knife and put it in his pocket. As Williams approached his car, Lewis "snatched ... back" at him. Ultimately, Lewis told Williams he did not want to fight anymore. Lewis appeared tired, but not injured. Williams left, but he did not call the police. Williams did not know he stabbed Lewis 11 times.

**Jury Instructions, Verdict, and Sentence**
The court instructed the jury on first and second degree murder, and with voluntary manslaughter based on imperfect self-defense (CALCRIM Nos. 500, 520, 521, 571). Additionally, the court instructed the jury on self-defense (CALCRIM No. 505), i.e. that a defendant can act in lawful self-defense if "[t]he defendant used no more force than was reasonably necessary to defend against that danger." It further instructed the jury that

"[t]he defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified," and that "[a] defendant is not required to retreat. He ... is entitled to stand his ... ground and defend himself ... and, if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed. This is so even if safety could have been achieved by retreating."

The court also instructed the jury with CALCRIM No. 3472, that "[a] person does not have the right to self-defense if he ... provokes a fight or quarrel with the intent to create an excuse to use force." (CALCRIM No. 3472.) [FN 3.] Finally, the court instructed the jury with CALCRIM No. 3474, which provides: "The right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist. When the attacker no longer appears capable of inflicting any injury, then the right to use force ends."

> [FN 3: Defense counsel objected to the instruction, claiming it was "not based on any evidence presented at the trial." At an unreported conference, the court and the parties discussed jury instructions. Then, at a reported hearing, the court noted the instructions it would deliver, and that CALCRIM No. 3471 was "withdrawn." CALCRIM No. 3471 was not among the jury instructions requested by the prosecutor.]

The prosecutor urged the jury to convict Williams of first degree murder. According to the prosecutor, William's version of the incident was that Williams "didn't intend to kill him. He just wanted to settle this thing. That [Lewis] brought the knife, and that ... [Williams] was able to disarm [Lewis] and things went horribly awry.... [¶] But remember this. Again, this is an instruction from the Judge. A person does not have the right to self-defense if he provokes the fight or quarrel with the intent to create an excuse to use force. That's what we have here. [¶] What did ... Williams do? He stopped, got out of the car, confronted the victim, and now he is saying self-defense. [¶] You do not have a right to provoke a quarrel in order to use that defense." The prosecutor also urged the jury to reject a voluntary manslaughter verdict.

In his closing, defense counsel argued Williams was not guilty because he acted in "legal self-defense." According to counsel, the two men "agreed to meet ... and when they did Mr. Williams was surprised by the presence of the knife. [¶] ... [Williams] wasn't expecting to see the knife ... he wasn't expecting to be accosted with a knife." Counsel argued the evidence supported a "justifiable response to the attack .... The choking absolutely put him in imminent peril of death, and he responded with just enough force to escape that death."

On rebuttal, the prosecutor urged the jury to conclude Williams's "story of ... agreeing to this fight" did not make sense. According to the prosecutor, it "[d]oesn't make sense that these two guys are going to settle their matter with what's pretty serious, getting shot, with fisticuffs. Does that make any sense? And they're going to do it ... during work hours in broad daylight in a public place where people are going to and from their cars. They're actually planning this. We're going to go around the corner and settle our differences ... we're going to go do it in front of this commercial building."

The jury convicted Williams of second degree murder (§ 187, subd. (a)) and found true the allegation he personally used a deadly and dangerous weapon (§ 12022, subd. (b)(1)). The trial court found Williams's prior convictions true, struck one prior pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal. 4th 497 and sentenced Williams to 31 years to life in state prison.

Williams, 2017 WL 6334240, at *1–4.

## III. DISCUSSION

### A.   Legal Standard

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the

Order Denying Petition for Writ of Habeas Corpus; Denying COA
P:\PRO-SE\EJD\HC.18\04859Williams_den-habeas.docx

holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Williams, 529 U.S. at 412; Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. The federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Here, as noted above, the California Supreme Court summarily denied Petitioner's petitions for review. See supra at 2; Pet., Ex. A. The state appellate court, on direct review, addressed the claims in the instant petition. Ans., Ex. F. The state appellate court thus was the highest court to have reviewed the claims in a reasoned decision, and it is that decision that this Court reviews herein. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court

Order Denying Petition for Writ of Habeas Corpus; Denying COA
P:\PRO-SE\EJD\HC.18\04859Williams_den-habeas.docx

decisions.  See Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam); Harrington v. Richter, 131 S. Ct. 770, 783-85 (2011); Felkner v. Jackson, 131 S. Ct. 1305 (2011) (per curiam).  As the Court explained:  "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'"  Id. at 1307 (citation omitted).  With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

**B**.     **Claims and Analysis**

Petitioner raises the following grounds for federal habeas relief:[1] that by failing to instruct the jury on CALCRIM 3471 ("the CALCRIM 3471 Instruction"), the trial court (1) erred as a matter of California law, see Pet., Ex. B at 11-16 and 22-26; that the failure to give the CALCRIM 3471 Instruction also (2) violated Petitioner's right to due process, see id. at 17, 19-22; and (3) that Petitioner's counsel was ineffective in failing to request the CALCRIM 3471 Instruction, see id. at 18.  Petitioner argues that the trial court also (4) violated his due process by failing to sua sponte instruct the jury on voluntary manslaughter, see id. at 27-33.  Petitioner challenges hearsay statements admitted at trial, contending that the admission of these statements (5) erred as a matter of California law, thus violating his due process, see id. at 34-35; (6) violated Petitioner's rights under the Confrontation Clause, see id. at 35; and (7) allowed the jury to hear improper bad character evidence in violation of Petitioner's right to due process, see id. at 36.  Finally, Petitioner claims (8) cumulative error, see id. at 37.

Because these claims relate to the same facts, the Court will first address Petitioner's claims regarding the omission of the CALCRIM 3471 Instruction (Claims 1-3).  Next the Court will address Petitioner's claim related to the omission of a jury

---

[1] Although the Court's screening order identified only four claims, see Dkt. No. 11 at 2, a closer reading of the Petition reveals that Petitioner stated multiple claims for each perceived error, stating eight claims in total.  As the Court concludes that Petitioner is not entitled to relief for any of these claims, Respondent is not prejudiced by the Court's failure to identify these claims in the screening order.

instruction on voluntary manslaughter (Claim 4). The Court will then address Petitioner's claims regarding the admission of hearsay statements (Claims 5-7). Finally, the Court will address Petitioner's claim of cumulative error (Claim 8).

### 1.     <u>Claims Related to the CALCRIM 3471 Instruction</u>

As noted, <u>supra</u>, Petitioner contends that the trial court should have given the CALCRIM 3471 Instruction. Petitioner argues that by failing to do so, the trial court (1) erred as a matter of California law, and (2) violated Petitioner's right to due process. Petitioner also argues (3) that Petitioner's counsel was ineffective in failing to request the CALCRIM 3471 Instruction.

The state appellate court rejected Petitioner's arguments, finding that the jury was able to consider Petitioner's self-defense claim:

> Williams contends the court erred by failing to sua sponte instruct the jury with CALCRIM No. 3471. That instruction provides: "A person who [engages in mutual combat or who starts a fight] has a right to self-defense only if: [¶] (1) [he] actually and in good faith tried to stop fighting; ... [¶] (2) [he] indicated by word or by conduct to [his] opponent, in a way that a reasonable person would understand that [he] wanted to stop fighting and that [he] had stopped fighting[; and] (3) [he] gave [his] opponent a chance to stop fighting. [¶] If the defendant meets these requirements, [he] then had a right to self-defense if the opponent continued to fight."
>
> When the person claiming self-defense was engaged in mutual combat, CALCRIM No. 3471 also provides: "[However, if the defendant used only nondeadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend [himself] with deadly force and was not required to try to stop fighting [,] communicate the desire to stop to the opponent[, or give the opponent a chance to stop fighting].] [¶] [A fight is *mutual* combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose.]"
>
> Williams contends he was entitled to CALCRIM No. 3471 because he and Lewis agreed to engage in mutual combat. A trial court must instruct the jury on all general principles of law that are """closely and openly connected to the facts and that are necessary for the jury's understanding of the case,""" provided the instruction is supported by substantial evidence. (*People v. Burney* (2009) 47 Cal.4th 203, 246.) We assume for the sake of

argument substantial evidence supports the conclusion that Lewis and Williams "*consented or intended to fight before the claimed occasion for self-defense arose.*" (*People v. Ross* (2007) 155 Cal. App. 4th 1033, 1046–1047; *People v. Tufunga* (1999) 21 Cal. 4th 935, 944 [doubts as to sufficiency of evidence warranting an instruction should be resolved in the defendant's favor].)

Williams argues the court's erroneous failure to instruct the jury with CALCRIM No. 3471 "deprived [him] of the right to have the jury correctly evaluate his use of self-defense." According to Williams, the court should have instructed the jury with CALCRIM Nos. 3471 and 3472 "in tandem" because "a person who starts a fight with non-deadly force, as [Williams] did here, does not forfeit the right to self-defense if his opponent is the first person to use deadly force. Instead, if the initial attacker does not start the fight with deadly force, he may regain the right to self-defense, if his opponent is the first to use deadly force and uses it suddenly."

To determine whether the failure to instruct the jury was prejudicial, we briefly discuss the two jury instructions. Under CALCRIM No. 3471, a defendant who engages in mutual combat, or who starts a fight, ordinarily has a right to self-defense only where three criteria are satisfied: (1) the defendant "actually and in good faith tried to stop fighting;" (2) the defendant communicated to his opponent the intent to cease fighting and that he had stopped fighting; and (3) the defendant gave his "opponent a chance to stop fighting." (CALCRIM No. 3471; see also *People v. Ramirez* (2015) 233 Cal. App. 4th 940, 946, fn. 1 (*Ramirez* ).) But the defendant need not try to stop fighting—or communicate the desire to stop fighting—where the opponent suddenly resorts to deadly force in response to the defendant's nondeadly attack. (*Ramirez,* at p. 946, fn. 1.) "CALCRIM No. 3471 charges a jury to make a *preliminary determination* of whether the defendant had the *right* to use force to defend himself when the defendant and the victim engaged in mutual combat, or when the defendant was the initial aggressor." (*People v. Johnson* (2009) 180 Cal. App. 4th 702, 711 (*Johnson* ).)

CALCRIM No. 3472, entitled "Right to Self–Defense: May Not Be Contrived," states: "A person does not have the right to self-defense if he ... provokes a fight or quarrel with the intent to create an excuse to use force." The import of this instruction is that "'self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense.'" (*People v. Enraca* (2012) 53 Cal. 4th 735, 761.) CALCRIM No. 3472 "is a correct statement of law." (*People v. Eulian* (2016) 247 Cal. App. 4th 1324, 1334 (*Eulian* ).)

CALCRIM No. 3472, however, does not apply to every defendant who initiates a fight and subsequently claims self-defense. Instead, CALCRIM No. 3472 "applies to a subset of

individuals who not only instigate a fight, but do so with the *specific intent* that they contrive the necessity for their acting thereafter in 'self-defense,' and thus justify their further violent actions.... [T]his instruction applies, and the right to self-defense is lost, only if an initial aggressor commences combat for the intended purpose of provoking a violent reaction so that he or she can then retaliate with further violence, whether deadly force or nondeadly force, under the guise of self-defense. The defendant's intent is measured at the time the fight or quarrel is provoked." (*Ramirez, supra,* 233 Cal. App. 4th at p. 954, italics added (dis. opn. of Fybel, J.).)

In other words, CALCRIM No. 3472 pertains to a situation where the defendant starts a fight with a forbidden purpose: to create an excuse to use force. (*Ramirez, supra*, 233 Cal. App. 4th at p. 955 [CALCRIM No. 3472 contains a "scienter requirement" that the defendant contrived a situation to use force]; *People v. Hinshaw* (1924) 194 Cal. 1, 26 [instruction recognizes principle that self-defense is " 'not available' " where the defendant " 'has sought a quarrel with the design to force a deadly issue and thus, through his fraud, contrivance or fault, to create a real or apparent necessity for making a felonious assault' "].)

"CALCRIM No. 3472 instructs that even if initial aggressors or mutual combatants satisfy the requirements of CALCRIM No. 3471, they are not permitted to assert the right to self-defense if they initially engaged in that activity for the purpose of contriving the opportunity to engage in further violence in response to their adversary's reaction." The scienter requirement in CALCRIM No. 3472—"with the intent to create an excuse to use force"—distinguishes that instruction "in substance and purpose from CALCRIM No. 3471." (*Ramirez, supra,* 233 Cal. App. 4th at p. 957 (dis. opn. of Fybel, J.).)

Here, the court's failure to instruct the jury with CALCRIM No. 3471 did not—as Williams contends—negate a self-defense theory. The court delivered several self-defense instructions, including justifiable homicide (CALCRIM No. 505), voluntary manslaughter: imperfect self-defense (CALCRIM No. 571), and when the right to use force in self-defense ends (CALCRIM No. 3474). These instructions did not preclude the jury from considering Williams's testimony on his right to self-defense, nor did they prevent the jury from finding Williams acted in perfect or imperfect self-defense. (See *Johnson, supra,* 180 Cal. App. 4th at pp. 708, 711 ["the trial court's instructions assumed that defendant had not lost [the] right" to self-defense, even where the court instructed the jury with CALCRIM No. 3472, but not CALCRIM No. 3471].) [FN 4.]

> [FN 4: Nor did the court's failure to instruct the jury with CALCRIM No. 3471 lessen the prosecution's burden of proof. The court instructed the jury on malice (CALCRIM No. 520), the presumption of innocence, and the

prosecutor's burden of proof (CALCRIM Nos. 103, 220).]

Assuming the *Chapman* standard applies, we are convinced any error in failing to instruct the jury with the following language in CALCRIM No. 3471 was harmless beyond a reasonable doubt: "if the defendant used only non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend [himself] with deadly force and was not required to try to stop fighting [or] communicate the desire to stop to the opponent[, or give the opponent a chance to stop fighting]." Williams testified the two men agreed to have a fist fight, and Lewis rushed at him with a knife. As Williams and Lewis fought for control of the knife, Lewis choked Williams, who tried to "save" himself by stabbing Lewis. In closing argument, defense counsel argued Lewis and Williams agreed to meet, and when they did, Lewis surprised Williams with a knife and a struggle ensued. Counsel argued the stabbing was a "justifiable response to the attack."

Thus, the question presented to the jury was whether Williams exercised his right to self-defense in a reasonable manner when he stabbed Lewis 11 times—that is, whether he reasonably believed he was in danger and that force was necessary to defend himself, and whether he used no more force than reasonably necessary. (See *Johnson, supra*, 180 Cal. App. 4th at p. 711; see also *Eulian, supra*, 247 Cal. App. 4th at pp. 1334–1335.) The court instructed the jury to determine whether Williams acted in reasonable self-defense, just as it would have had the court instructed the jury with CALCRIM No. 3471. (*Johnson*, at p. 711.) In returning a verdict of second degree murder, the jury rejected Williams's implausible self-defense claim and found beyond a reasonable doubt he did not have even an unreasonable belief in the need for self-defense. Under the circumstances, the court's failure to instruct the jury with CALCRIM No. 3471 was harmless beyond a reasonable doubt. (See *People v. Salas* (2006) 37 Cal. 4th 967, 984, 983 [failing to instruct on an affirmative defense not prejudicial even under the "more rigorous *Chapman* test" where, "[i]n light of the prosecution's evidence, ... no reasonable jury would believe [the defendant's] testimony"]; *People v. Moon* (2005) 37 Cal. 4th 1, 32 [assumed error in failing to instruct the jury was harmless under the *Watson* and *Chapman* standards].)

Williams's reliance on the majority opinion in *Ramirez, supra*, 233 Cal. App. 4th 940 does not alter our conclusion. In that case, two codefendants provoked a fistfight with rival gang members. (*Id.* at p. 944.) One defendant testified that during the fight, a rival gang member pulled out what appeared to be a gun, so the defendant pulled out his own gun and shot the rival gang member. (*Id.* at p. 945.) The trial court instructed the jury with CALCRIM Nos. 3471 and 3472 (*Id.* at pp. 945, 948) and with a modified version of CALCRIM No. 571, which told the jury the principle of imperfect self-defense could not be invoked if,

among other things, a defendant invited "'a physical assault.'" (*Id.* at p. 952.) During closing arguments, the prosecutor repeatedly argued, based on the language of CALCRIM No. 3472, that even if the jury believed the defendants sought to provoke only a fistfight, their intent to use force—even a nondeadly fistfight—meant they forfeited any claim of self-defense. (*Id.* at pp. 943, 945–946.) The jury found the defendants guilty of first degree murder. (*Id.* at p. 943.)

The *Ramirez* majority reversed the first degree murder convictions. It determined that giving CALCRIM Nos. 3471 and 3472, in combination with the prosecutor's repeated misstatement of the law in closing arguments, "prevented the jury from considering their self-defense claim." (*Ramirez, supra,* 233 Cal. App. 4th at p. 945.) *Ramirez* is distinguishable. Here, the court did not give CALCRIM No. 3471, and the prosecutor did not make repeated and "forceful" misstatement about the law of self-defense. (*Id.* at pp. 952, 950.) Nor did the court deliver a modified version of CALCRIM No. 571. The prosecutor referred to CALCRIM No. 3472 only once during closing argument. Beyond that, the prosecutor did not argue Williams was precluded from claiming self-defense, only that the jury should not interpret the evidence to justify Williams's entitlement to self-defense. [FN 5.] And as discussed above, defense counsel argued Williams acted in self-defense. In contrast to *Ramirez*, the jury was not prevented from considering Williams's self-defense claim.

> [FN 5: Williams's reliance on *People v. Vasquez* (2006) 136 Cal. App. 4th 1176, is also misplaced. In that case, the court refused to instruct the jury on imperfect self-defense. Here, the jury was instructed on imperfect self-defense.]

Williams, 2017 WL 6334240, at *4–7.

### a. Claim 1 is not cognizable.

Claim 1, that the trial court's decision not to give the CALCRIM 3471 Instruction violated California law, is not cognizable because it is based on state, rather than federal, law.

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991)); see also Stanton v. Benzler, 146 F.3d 726, 728 (9th Cir. 1998) (state law determination that arsenic trioxide is a poison as a matter of law, not element of crime for jury determination, not open to challenge on federal habeas review). Nor does the fact that

a jury instruction was inadequate by Ninth Circuit direct appeal standards mean that a petitioner who relies on such an inadequacy will be entitled to habeas corpus relief from a state court conviction.  See Duckett v. Godinez, 67 F.3d 734, 744 (9th Cir. 1995) (citing Estelle, 502 U.S. at 71–72).

Indeed, the Supreme Court has repeatedly held that the federal habeas writ is unavailable for violations of state law or for alleged error in the interpretation or application of state law.  See Swarthout v. Cooke, 131 S. Ct. 859, 861-62 (2011); Estelle, 502 U.S. at 67-68; Engle v. Isaac, 456 U.S. 107, 119 (1982); Peltier v. Wright, 15 F.3d 860, 861-62 (9th Cir. 1994); see, e.g., Little v. Crawford, 449 F.3d 1075, 1082 (9th Cir. 2006) (claim that state supreme court misapplied state law or departed from its earlier decisions does not provide a ground for habeas relief); Moore v. Rowland, 367 F.3d 1199, 1200 (9th Cir. 2004) (per curiam) (state's violation of its separation-of-powers principles does not give rise to a federal due process violation); Stanton, 146 F.3d at 728 (state law determination that arsenic trioxide is a poison as a matter of law and not an element of the crime for jury determination is not open to challenge on federal habeas review); Franklin v. Henry, 122 F.3d 1270, 1272-73 (9th Cir. 1997) (court was bound by state court finding that a violation of state law had occurred, but still had to consider whether the violation amounted to a federal constitutional error).

Because Petitioner's first claim is based purely on state law of which the interpretation or application is not cognizable in federal habeas, see Swarthout, 131 S. Ct. at 861-62; Estelle, 502 U.S. at 67-68, it is not cognizable.

### b.  Claim 2 fails because Petitioner's due process rights were not violated.

Claim 2, that the trial court's failure to give the CALCRIM 3471 Instruction prevented the jury from considering Petitioner's theory of self-defense and thereby deprived Petitioner of due process, fails because the absence of the CALCRIM 3471 Instruction did not prevent the jury from considering Petitioner's theory.

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding. <u>See</u> <u>Dunckhurst v. Deeds</u>, 859 F.2d 110, 114 (9th Cir. 1988). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. <u>See</u> <u>id.</u> Also, the omission of an instruction is less likely to be prejudicial than a misstatement of the law. <u>See</u> <u>Walker v. Endell</u>, 850 F.2d at 475-76 (citing <u>Henderson v. Kibbe</u>, 431 U.S. 145, 155 (1977)). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 624 (9th Cir. 1997) (quoting <u>Henderson</u>, 431 U.S. at 155.). The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given. <u>Murtishaw v. Woodford</u>, 255 F.3d 926, 971 (9th Cir. 2001) (quoting <u>Henderson</u>, 431 U.S. at 156); <u>see</u> <u>id.</u> at 972 (due process violation found in capital case where petitioner demonstrated that application of the wrong statute at his sentencing infected the proceeding with the jury's potential confusion regarding its discretion to impose a life or death sentence).

The instruction may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. <u>See Estelle</u>, 502 U.S. at 72. A habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error but are not entitled to habeas relief unless the error resulted in "actual prejudice." <u>Id</u>. (citation omitted).

Here, considering the instructions as a whole, Petitioner's right to due process was not violated. <u>First</u>, the state appellate court found that there was no state-law error because the CALCRIM 3471 Instruction was not required under California law. <u>See Williams</u>, 2017 WL 6334240, at *6 (rejecting petitioner's argument that the instruction was required

Order Denying Petition for Writ of Habeas Corpus; Denying COA
P:\PRO-SE\EJD\HC.18\04859Williams_den-habeas.docx

1    under People v. Ramirez, 233 Cal. App. 4th 940, 946 (2015)). The state appellate court's

2    determination is binding on this court. See Menendez v. Terhune, 422 F.3d 1012, 1029

3    (9th Cir.2005) (state court's determination that, under state law, insufficient evidence

4    warranted a defense instruction, was dispositive of instructional error claim). Because

5    there was no error, Petitioner has failed to show that the absence of the CALCRIM 3471

6    Instruction by itself so infected the entire trial that the resulting conviction violates due

7    process. See Estelle, 502 U.S. at 71-72 (stating the standard); see also Seagrave v. Gomez,

8    974 F.2d 1343 (9th Cir. 1992) ("There is no reasonable likelihood that the jury applied the

9    instructions in a manner that violated the Constitution. . . . First, the court's instruction

10   was a correct statement of state law.") (citation omitted); see also Fernandez v. Beard, No.

11   C 13-04671 BLF (PR), 2015 WL 417181, at *7 (N.D. Cal. Jan. 27, 2015) (rejecting habeas

12   claim predicated on a jury instruction where, inter alia, the jury instruction was correct).

13        Second, even if the trial court had erred in denying the requested instruction, the

14   error did not have a substantial and injurious effect or influence in determining the jury's

15   verdict. See Brecht, 507 U.S. at 637; Calderon v. Coleman, 525 U.S. 141, 146-47 (1998).

16   The state appellate court found that the jury could have considered Petitioner's testimony

17   regarding his right to self-defense, notwithstanding the absence of the CALCRIM 3471

18   Instruction. See Brecht, 507 U.S. at 637 ("These instructions did not preclude the jury

19   from considering Williams's testimony on his right to self-defense, nor did they prevent

20   the jury from finding Williams acted in perfect or imperfect self-defense."). The state

21   appellate court also found that the jury could reasonably have "rejected [Petitioner's]

22   implausible self-defense claim" that he "exercised his right to self-defense in a reasonable

23   manner when he stabbed [the victim] 11 times." Williams, 2017 WL 6334240, at *6. The

24   Court agrees. Because, in giving CALCRIM Instruction 3472, "[t]he [trial] court

25   instructed the jury to determine whether Williams acted in reasonable self-defense, just as

26   it would have had the court instructed the jury with CALCRIM No. 3471," id., the given

27   instructions and the missing CALCRIM 3471 Instruction were duplicative. Therefore, it

28

1    cannot be said that the jury would have reached a different verdict had they been given the

2    CALCRIM 3471 Instruction as well.  Accordingly, the Court finds that the failure to give

3    the CALCRIM 3471 Instruction did not have a substantial and injurious effect or influence

4    in determining the jury's verdict.  See Brecht, 507 U.S. at 637.  Petitioner is not entitled to

5    habeas relief based on harmless error.  See Calderon, 525 U.S. at 146-47.

6         Because the trial court does not appear to have erred in declining to give the

7    CALCRIM 3471 Instruction, and because any error would have been harmless, the state

8    appellate court's denial of this claim was not contrary to, or an unreasonable application

9    of, clearly established Supreme Court law.

### c.  Claim 3 fails because counsel was not ineffective for failing to request the CALCRIM 3471 Instruction.

12        Claim 3, that trial counsel was ineffective in failing to ask the judge to give the

13    CALCRIM 3471 Instruction, fails because Petitioner was not prejudiced by the lack of this

14    instruction.

15        In order to prevail on a Sixth Amendment claim for ineffectiveness of trial counsel,

16    Petitioner must establish two things.  First, he must establish that counsel's performance

17    was deficient, i.e., that it fell below an "objective standard of reasonableness" under

18    prevailing professional norms.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984).

19    Second, he must establish that he was prejudiced by counsel's deficient performance, i.e.,

20    that "there is a reasonable probability that, but for counsel's unprofessional errors, the

21    result of the proceeding would have been different."  Id. at 694.  A court need not

22    determine whether counsel's performance was deficient before examining the prejudice

23    suffered by the defendant as the result of the alleged deficiencies.  Id. at 697.

24        A "doubly" deferential judicial review is appropriate in analyzing ineffective

25    assistance of counsel claims under § 2254.  See Cullen v. Pinholster, 131 S. Ct. 1388,

26    1410-11 (2011); Harrington, 131 S. Ct. at 788 (same); Premo v. Moore, 131 S. Ct. 733,

27    740 (2011) (same).  The general rule of Strickland, i.e., to review a defense counsel's

28

1  effectiveness with great deference, gives the state courts greater leeway in reasonably

2  applying that rule, which in turn "translates to a narrower range of decisions that are

3  objectively unreasonable under AEDPA." Cheney v. Washington, 614 F.3d 987, 995 (9th

4  Cir. 2010) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). When

5  § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The

6  question is whether there is any reasonable argument that counsel satisfied Strickland's

7  deferential standard." Harrington, 131 S. Ct. at 788. Under a "doubly" deferential judicial

8  review, the state appellate court did not unreasonably apply Strickland in rejecting

9  Petitioner's argument. See Pinholster, 131 S. Ct. at 1410-11; Harrington, 131 S. Ct. at 88.

10     Petitioner's argument that trial counsel should have requested different jury

11  instructions fails. First, as noted above, the state appellate court found that the jury was

12  able to consider Petitioner's self-defense theory, and defense counsel was able to put a

13  self-defense argument to the jury. See supra at 16; see also Williams, 2017 WL 6334240,

14  at *7. Because the CALCRIM 3471 Instruction would have been duplicative, counsel was

15  not ineffective in failing to request it. See United States v. Bosch, 914 F.2d 1239, 1248

16  (9th Cir. 1990) (finding that, where a jury instruction would have been duplicative, counsel

17  was not ineffective for failing to request it).

18     Second, even if counsel's failure to request the CALCRIM 3471 Instruction had

19  been ineffective, Petitioner has not shown that "the result of the proceeding would have

20  been different" had the CALCRIM 3471 Instruction been given. As the state appellate

21  court noted, the jury reasonably "rejected [Petitioner's] implausible self-defense claim"

22  that he "exercised his right to self-defense in a reasonable manner when he stabbed [the

23  victim] 11 times." Williams, 2017 WL 6334240, at *6. As Respondent notes, "there was

24  not only overwhelming evidence presented at trial to support the jury's verdict of murder,

25  but the evidence belied petitioner's claim of self-defense." Ans. at 13-14. Specifically,

26  three witnesses testified that Petitioner did not act in self-defense, see id. at 14 (citing

27  record), the autopsy suggested that the victim's wounds were defensive, see id. (same), and

28

Order Denying Petition for Writ of Habeas Corpus; Denying COA
P:\PRO-SE\EJD\HC.18\04859Williams_den-habeas.docx

Petitioner sustained no injuries, <u>see id</u>. (same).  Petitioner has not cited any evidence to undercut this overwhelming evidence of guilt, nor made any argument that would render his self-defense argument plausible.  Accordingly, Petitioner has not shown the result of the proceeding would have been different had counsel requested the CALCRIM 3471 Instruction, and so has not shown he was prejudiced by counsel's decision.

For these reasons, Petitioner is not entitled to relief on Claims 1-3.

## 2. <u>Claim Related to the Voluntary Manslaughter Instruction</u>

As noted, <u>supra</u>, Petitioner contends that the trial court should have given a sua sponte instruction on the heat of passion theory of voluntary manslaughter.  <u>See</u> Pet., Ex. B at 27-32.  Petitioner argues that by failing to do so, the trial court violated Petitioner's right to due process (Claim 4).  <u>See id</u>.  The state appellate court rejected Petitioner's claim as follows:

> Next, William[s] argues the court erred by failing to instruct the jury on the heat of passion theory of voluntary manslaughter.  A trial court has a sua sponte duty to instruct the jury on all lesser included offenses supported by substantial evidence. (*People v. Breverman* (1998) 19 Cal. 4th 142, 148–149, 162.)  Voluntary manslaughter is a lesser included offense of murder.  (*Id.* at p. 154.)  "'[W]hen the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)),'" the defendant is deemed to have acted without malice, even if he intended to kill.  (*People v. Blakeley* (2000) 23 Cal. 4th 82, 87–88.)  Thus, a killing "'upon a sudden quarrel or heat of passion'" can negate the malice element of murder and reduce the offense to voluntary manslaughter. (*Breverman,* at p. 163.)
>
> "Although section 192, subdivision (a), refers to 'sudden quarrel or heat of passion,' the factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation.  The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.  [Citations.]  The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.  [Citations.] 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment."'" (*People v. Lee* (1999) 20 Cal.4th 47, 59.)

19

According to Williams, his trial testimony presented "a classic, textbook example of provocation" warranting the heat of passion instruction. We disagree. Williams testified Lewis "mugg[ed]" him and suggested they "handle" things around the corner. He also testified Lewis got out of his car in an aggressive manner, threw something at Williams's car, and came toward him with a knife. Williams claimed he swung the knife wildly and stabbed Lewis to "save" himself. The thrust of Williams's testimony "was self-defense—both reasonable self-defense (a complete defense to the criminal charges), and unreasonable or imperfect self-defense (a partial defense that reduces murder to manslaughter)." (*People v. Moye* (2009) 47 Cal. 4th 537, 554 (*Moye* ).)

Williams's narrative of the events did not suggest he was under the influence of a strong passion when he killed Lewis. (*Moye, supra,* 47 Cal. 4th at p. 552.) The standard for requiring instruction on heat of passion voluntary manslaughter is not """"any evidence, no matter how weak,""" but evidence """"substantial enough to merit consideration" by the jury.'" (*Id.* at p. 553.) Here, the evidence did not support an instruction on voluntary manslaughter based on heat of passion. (*Id.* at p. 551.) "In the face of [Williams]'s own testimony, no reasonable juror could conclude [he] acted ""'rashly or without due deliberation and reflection, and from this passion rather than from judgment""'" when he responded to Lewis approaching him with a knife by stabbing Lewis *11 times*. (*Id.* at p. 553.)

As our high court has explained, "[a] trial court has a duty to instruct on general principles of law that are 'closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case.' [Citation.] But no principle of law required the trial judge below to disregard the evidence in order to find that the jury should consider whether defendant subjectively killed in the heat of passion, when no substantial evidence supported that theory of manslaughter, and the evidence actually introduced on the point—the defendant's own testimony—was to the contrary." (*Moye, supra,* 47 Cal. 4th at p. 554.) Williams's reliance on *People v. Barton* (1995) 12 Cal. 4th 186 does not alter our conclusion. That case—where the victim acted ""'berserk'" and tried to run the defendant's daughter's car off the road—is distinguishable. (*Id.* at p. 202.)

Assuming the court erred by failing to instruct the jury on a heat of passion theory of voluntary manslaughter, any "such error was harmless as it is not reasonably probable [Williams] would have obtained a more favorable outcome had the jury been so instructed." (*Moye, supra,* 47 Cal. 4th at p. 555–556.) As discussed above, the jury rejected Williams's claim of self-defense, and there was no "independent evidence remaining to support his further claim that he killed in the heat of passion, and no direct testimonial evidence from [Williams] himself to support an inference that he *subjectively* harbored such strong passion, or acted rashly or impulsively while under its influence

for reasons unrelated to his perceived need for self-defense."
(*Id.* at p. 557.)

<u>Williams</u>, 2017 WL 6334240, at *7–8.

In some circumstances, failure to give requested instructions violates due process. Specifically, the U.S. Supreme Court has held that in a capital case, where the evidence supports a verdict on a lesser-included offense, failure to instruct a jury on that lesser-included offense constitutes a violation of due process. <u>Hopper v. Evans</u>, 456 U.S. 605, 610–11 (1982); <u>Beck v. Alabama</u>, 447 U.S. 625, 634–38 (1980). However, the Supreme Court has limited application of that rule to the capital context. In 1973, the Court explained that it "ha[d] never explicitly held that the Due Process Clause of the Fifth Amendment guarantees the right of a defendant to have the jury instructed on a lesser included offense." <u>Keeble v. United States</u>, 412 U.S. 205, 213 (1973). When the Court later held that due process requires giving such an instruction in capital cases, the Court made clear that it was "not decid[ing] whether the Due Process Clause would require the giving of such instructions in a noncapital case." <u>Beck</u>, 447 U.S. at 638 n.14. In fact, the Ninth Circuit, "has declined to find constitutional error arising from the failure to instruct on a lesser included offense in a noncapital case." <u>Turner v. Marshall</u>, 63 F.3d 807, 819 (9th Cir. 1995), <u>overruled on other grounds by Tolbert v. Page</u>, 182 F.3d 677, 685 (9th Cir. 1999) (en banc). The failure of a state trial court to instruct on lesser-included offenses in a noncapital case does not present a federal constitutional claim. <u>See Solis v. Garcia</u>, 219 F.3d 922, 929 (9th Cir. 2000); <u>Windham v. Merkle</u>, 163 F.3d 1092, 1105–06 (9th Cir. 1998). Respondent's argument that Claim 4 "does not present a federal constitutional question," Ans., Ex. B at 15, is thus correct.

Even if this claim presented a constitutional question, it would fail. As discussed, <u>supra</u>, this Court must presume that the state appellate court was correct in finding insufficient evidence to support the voluntary manslaughter instruction. <u>See Menendez</u>, 422 F.3d at 1029-30. Here, as the state appellate court found after thorough analysis, Petitioner presented no evidence to warrant a heat-of-passion voluntary manslaughter

instruction.  See Williams, 2017 WL 6334240, at *7-8 (rejecting claim); see also id. at 8 (""there was no 'independent evidence remaining to support [Williams's] further claim that he killed in the heat of passion, and no direct testimonial evidence from [Williams] himself to support an inference that he subjectively harbored such strong passion, or acted rashly or impulsively'") (first two emphases added).  Nor was Petitioner entitled to a heat-of-passion voluntary manslaughter instruction under "the defendant's right to adequate jury instructions on his or her theory of the case."  Solis, 219 F.3d at 929.  As the state appellate court found, Petitioner's theory, and Petitioner's direct testimony, leaned toward a self-defense theory rather than a heat-of-passion theory.  See Williams, 2017 WL 6334240, at *8.  Because Petitioner did receive jury instructions regarding his (self-defense) theory of the case, any failure to instruct on heat-of-passion voluntary manslaughter thus did not deprive Petitioner of his right to jury instructions on his theory.

Finally, as the state appellate court found, even if the trial court had erred in failing to sua sponte instruct on heat-of-passion voluntary manslaughter (which it did not), any error was harmless.  See id. at *8.  With no evidence suggesting Petitioner acted in the heat of passion, and significant evidence that Petitioner acted deliberately when he stabbed his victim 11 times, the record before the jury tilted in favor of finding that Petitioner acted with premeditation and deliberation, not rashness.  Petitioner has introduced no evidence, and it seems unlikely considering the record, that "the result of the proceeding would have been different" had an instruction on heat-of-passion voluntary manslaughter been given.

Accordingly, Petitioner has not shown entitlement to habeas relief on Claim 4.

### 3.    Claims Related to the Admission of Hearsay

As noted, supra, Petitioner contends that the trial court erred in admitting hearsay statements.  Petitioner argues that in doing so, the trial court (5) erred as a matter of California law, thus violating his due process; (6) violated Petitioner's right to confront his accusers under the Confrontation Clause; and (7) violated Petitioner right to due process by allowing the jury to hear improper bad character evidence.

The state appellate court rejected Petitioner's challenge to the admission of the

hearsay statements:

> Williams claims the court erred by admitting statements Lewis
> made to family and friends before the homicide.
>
> **A. Background**
> After the defense completed its case-in-chief, the prosecutor
> moved to admit statements made by Lewis to two close friends,
> his girlfriend, and to his brother, pursuant to Evidence Code
> section 1250. The prosecutor argued Lewis's state of mind, and
> his attitude toward Williams, were at issue because: (1)
> Williams claimed he stabbed Lewis in self-defense; and (2)
> Williams testified he believed Lewis thought he was involved
> the June 2015 shooting and that Lewis was seeking revenge for
> that shooting. The prosecutor explained the "point of this
> testimony" was to show Williams "lied on the stand" about his
> issue with Lewis and that "the only issue [between the two men]
> was with the girl at work." Over defense counsel's objection,
> the court determined the evidence came within Evidence Code
> section 1250, and was relevant to rebut the defense claim that
> Lewis's problem with Williams related to the June 2015
> shooting.
>
> Lewis's friend, his girlfriend, and his brother testified on
> rebuttal. Lewis's friend testified Lewis said "he had some
> problems with a guy at work." Lewis "said the dude don't like
> him because ... he [thought] ... that [Lewis] was talking to a girl
> that the guy is talking to." Lewis also said "he wasn't worried
> about it." Lewis's girlfriend testified Lewis said had an issue
> "with a guy at work," and the issue was about "[a] girl." Lewis
> and his girlfriend discussed the June 2015 shooting; Lewis never
> said he suspected the guy at work was involved. Lewis's brother
> testified Lewis mentioned having an issue "with a guy at work."
> Lewis's brother understood the issue was "about a girl." When
> Lewis and his brother discussed the June 2015 shooting, Lewis
> did not say he was suspicious the guy from work "had anything
> at all do to with the shooting."
>
> The court instructed the jury that Lewis's statements were not to
> be considered for their truth, but only as evidence of Lewis's
> state of mind when he made those statements. The court also
> instructed the jury on limited purpose evidence (CALCRIM No.
> 303).
>
> **B. Any Assumed Error in Admitting Lewis's Statements
> Was Harmless**
> Williams claims the prosecution's rebuttal evidence did not
> come within Evidence Code section 1250. "Hearsay is a
> statement made other than while testifying as a witness, which
> statement is offered in the trial to prove the truth of the matter
> asserted in the statement." (*Rufo v. Simpson* (2001) 86 Cal. App.
> 4th 573, 591, italics and fn. omitted.) "Evidence Code section

1250, which authorizes the admission of out-of-court statements to prove the declarant's state of mind, permits the admission of such evidence only if the declarant's state of mind 'is itself an issue in the action' or if the evidence 'is offered to prove or explain acts or conduct of the declarant.'" (*People v. Riccardi* (2012) 54 Cal. 4th 758, 814–815, abrogated on another point in *People v. Rangel* (2016) 62 Cal. 4th 1216.)

We need not decide whether the court properly admitted the testimony under the state of mind hearsay exception, because any assumed error in admitting that testimony was harmless. (*People v. Becerrada* (2017) 2 Cal. 5th 1009, 1027.) The testimony "was minor in light of the case as a whole." (*Id.* at pp. 1027–1028.) And, as discussed above, the evidence supporting guilt was strong. (*People v. O'Malley* (2016) 62 Cal. 4th 944, 1008–1009 [erroneous admission of evidence under Evidence Code section 1250 "was harmless"]; *People v. Jablonski* (2006) 37 Cal. 4th 774, 821 [evidence erroneously admitted pursuant to Evidence Code section 1250 was harmless "in light of the overwhelming evidence of defendant's guilt"].)

<u>Williams</u>, 2017 WL 6334240, at *8-9.

### a. Claim 5 fails because Petitioner's due process was not violated.

Petitioner's first challenge to the admission of the victim's statements is that those statements were hearsay, and their admission in contravention of evidence rules violated his due process.

It is well-settled law that rulings on evidentiary matters by a state trial court, even if erroneous, may only be used as a basis for relief under Section 2254 if the ruling "renders the state proceedings so fundamentally unfair as to violate due process." <u>Spivey v. Rocha</u>, 194 F.3d 971, 977–78 (9th Cir. 1999) (citing <u>Hill v. United States</u>, 368 U.S. 424, 428 (1999)). A ruling to admit evidence by a state trial court only renders the state proceedings fundamentally unfair when "there are <u>no</u> permissible inferences the jury may draw from the evidence . . . ." <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 920 (9th Cir. 1991) (emphasis added). Moreover, even evidence admitted for which there are no permissible inferences must also "be of such a quality as necessarily prevents a fair trial." <u>Id</u>. (quotations omitted).

Here, there were clearly permissible inferences to be drawn from the victim's statements. A key argument in Petitioner's defense was that he acted in self-defense to the

victim's aggression. <u>See Williams</u>, 2017 WL 6334240, at *2–3 (summarizing defense counsel's argument that the victim rushed at Petitioner and Petitioner was scared, and that Petitioner stabbed the victim in order to save himself). By introducing the victim's statements, the prosecution was able to show that the victim had no motive to attack Petitioner, rebutting Petitioner's argument of self-defense. <u>See id</u>. at *8-9 (summarizing prosecutor's argument that the victim's statements showed the victim's state of mind). In addition, the statements were relevant to impeach Petitioner's testimony. <u>See id</u>. at *8.

Moreover, even if there were not at least two permissible inferences to be drawn from the victim's statements, the Court must consider whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637. In this case, it did not because as the state appellate court found, "the evidence supporting [Petitioner's] guilt was strong." <u>Williams</u>, 2017 WL 6334240, at *9. As noted above, three eyewitnesses saw the murder and testified that Petitioner did not act in self-defense, <u>see</u> Ans. at 14 (citing record), the autopsy suggested that the victim's wounds were defensive, <u>see id</u>. (same), and Petitioner sustained no injuries, <u>see id</u>. (same). Considering this "strong" evidence of Petitioner's guilt, any error in admitting the victim's out-of-court statements did not have a "substantial and injurious effect" on the verdict. <u>See Dillard v. Roe</u>, 244 F.3d 758, 769–70 (9th Cir. 2001), <u>amended on denial of reh'g</u> (May 17, 2001) ("Even if we assume, without deciding, that the trial court [committed constitutional error], that ruling could not have had a 'substantial and injurious effect or influence in determining the jury's verdict.' . . . There was an abundance of other, uncontradicted evidence that Dillard had suffered the convictions alleged.") (citations omitted). Based on the foregoing, the state appellate court's rejection of Petitioner's fifth claim was reasonable and is therefore entitled to AEDPA deference. Accordingly, this claim is DENIED.

**b. Claim 6 fails because Petitioner's Confrontation Clause right was not violated.**

Petitioner's sixth claim is that the admission of the victim's out-of-court statements violated his Sixth Amendment right to confront his accusers. See Pet., Ex. B at 35 ("The improper admission of this hearsay - - both actual and implied - - violated the state and federal confrontation clauses. Calif. Const. Art I, §§ 15, 16; U.S. Constitution, 6th and 14th Amendments"). For the reasons stated below, the Court finds that Petitioner's Sixth Amendment confrontation right was not violated.

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403 (1965). The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, though it is a procedural rather than a substantive guarantee. See Crawford v. Washington, 541 U.S. 36, 61 (2004). It commands not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. Id.; see Davis v. Alaska, 415 U.S. 308, 315–16 (1974) (noting a primary interest secured by the Confrontation Clause is the right of cross-examination). The Clause thus reflects a judgment, not only about the desirability of reliable evidence, but about how reliability can best be determined. Crawford, 541 U.S. at 61; see, e.g., United States v. Medjuck, 156 F.3d 916, 919 n.1 (9th Cir. 1998) (noting that the Confrontation Clause serves to ensure that witnesses will testify under oath, to force witnesses to undergo cross-examination, and to permit the jury to observe the demeanor of witnesses).

However, the Confrontation Clause only applies to out-of-court testimonial statements offered for the truth of the matter asserted, i.e., "testimonial hearsay." See Crawford, 541 U.S. at 51 (emphasis added). If a hearsay statement is not testimonial in nature, then it "is not subject to the Confrontation Clause." Davis v. Washington, 547 U.S.

United States District Court
Northern District of California

813, 821 (2006). Here, the trial court appears to have concluded that the victim's statements were hearsay, but subject to a hearsay exception. See Williams, 2017 WL 6334240, at *8 (explaining that the statements were admitted pursuant to California Evidence Code § 1250); see also Cal. Evid. Code § 1250 (contained in the chapter entitled "Exceptions to the Hearsay Rule"). Accordingly, the Court will not examine whether the victim's statements were hearsay but will skip to the inquiry of whether the victim's statements were testimonial in nature, and thus subject to the Confrontation Clause.

The "primary purpose" test establishes whether a statement is testimonial. Ohio v. Clark, 135 S. Ct. 2173, 2179 (2015). Under this test, statements are testimonial: (1) "when they result from questioning, 'the primary purpose of [which was] to establish or prove past events potentially relevant to later criminal prosecution,'" and (2) "when written statements are 'functionally identical to live, in-court testimony,' 'made for the purpose of establishing or proving some fact' at trial." Lucero v. Holland, 902 F.3d 979, 989 (9th Cir. 2018) cert. denied, 139 S. Ct. 1180 (2019) (citations omitted). When the primary purpose of taking an out-of-court statement is to create an out-of-court substitute for trial testimony, the statement is testimonial hearsay and Crawford applies. See Michigan v. Bryant, 562 U.S. 344, 358 (2011) (explaining the primary purpose inquiry). When that was not the primary purpose, "the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." Id.

"The 'primary purpose' of a statement is determined objectively." United States v. Rojas-Pedroza, 716 F.3d 1253, 1267 (9th Cir. 2013). Thus "'the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.'" Id. (quoting Bryant, 562 U.S. at 360). The testimonial intent of the speaker must be evaluated in context, and part of that context is the questioner's identity. Lucero, 902 F.3d at 990 n.5.

Here, the victim's statements were non-testimonial, and therefore not subject to the

Confrontation Clause.  First, the statements were non-testimonial as a matter of law

because they were not made to law enforcement personnel, or to persons the victim

believed were working with law enforcement.  "No Supreme Court authority has held that

statements made to someone other than law enforcement personnel are testimonial."

Schubert v. Warner, 605 F. App'x 688 (9th Cir. 2015) (finding that statements to a family

friend were non-testimonial).  See also Saechao v. Oregon, 249 F. App'x 678, 679 (9th

Cir. 2007) (a conversation "between two friends, without any active participation by a

government official" was non-testimonial); cf. Bryant, 562 U.S. at 359 n.3 ("*Davis*

explicitly reserved the question 'whether and when statements made to someone other than

law enforcement personnel are "testimonial."' *Ibid.*  We have no need to decide that

question in this case either because Covington's statements were made to police

officers.").  Here, the persons to whom the victim made his statements were "two close

friends, his girlfriend, and [] his brother."  Williams, 2017 WL 6334240, at *8; see also

Pet., Ex. B at 34 (identifying the witnesses to whom the victim spoke as "Kenya Bishop

(Lewis's girlfriend), Melvin Boyd, Delvone Jones, and Lewis'[s] brother Michael Lewis").

There is no argument, and nothing in the record, to suggest that any of these persons are in

law enforcement.  See generally, Pet.; see also, Ans., Exs. A-B.  As none of these

witnesses were members of or working for law enforcement, the victim could not have had

testimonial intent in making the challenged statements.  See Crawford, 541 U.S. at 51

(describing "statements made unwittingly to an FBI informant" as non-testimonial,

because of the declarant's ignorance of the witness's role).

Second, the circumstances surrounding the conversations in which the victim made

these statements show that the statements were non-testimonial.  The United States

Supreme Court has explained that "[s]tatements to friends and neighbors about abuse and

intimidation" are not testimonial.  Giles v. California, 554 U.S. 353, 376 (2008); see also.

Bryant, 562 U.S. at 381 ("For an out-of-court statement to qualify as testimonial, the

1  declarant must intend the statement to be a solemn declaration rather than an unconsidered

2  or offhand remark; and he must make the statement with the understanding that it may be

3  used to invoke the coercive machinery of the State against the accused. . . . That is what

4  distinguishes a narrative told to a friend over dinner from a statement to the police.")

5  (Scalia, J., dissenting); <u>United States v. Palamarchuk</u>, 791 F. App'x 658, 662 (9th Cir.

6  2019) ("a conversation between friends over dinner" is non-testimonial); <u>Lara v. Allison</u>,

7  617 F. App'x 769, 770 (9th Cir. 2015) ("statements [made] during an unprompted,

8  informal conversation between coworkers at their place of employment" are non-

9  testimonial; <u>Williams v. Adams</u>, 447 F. App'x 829, 831 (9th Cir. 2011) (statements made

10 to family members are non-testimonial). There is no suggestion in the record that the

11 victim believed his statements to friends, his girlfriend, and his family would be "used to

12 invoke the coercive machinery of the State." <u>Bryant</u>, 562 U.S. at 381. Instead, the record

13 reveals that the above statements were made during casual conversation. For example, the

14 victim told his friend Mr. Boyd that the victim "had some problems with a guy at work"

15 regarding "a girl that the guy is talking to," but that the victim "wasn't worried about it."

16 Ans., Ex. B at 972:15-973:6. The victim told Mr. Boyd this while the two were in Mr.

17 Boyd's bedroom, and Mr. Boyd was doing pushups. <u>See</u> Ans., Ex. B at 971:17-972:16.

18 Discussing work problems with a friend, in the friend's bedroom, while the friend

19 exercises, does not suggest the victim intended to make a "solemn declaration." <u>See</u>

20 <u>Bryant</u>, 562 U.S. at 381 (describing the type of statement and intent that would be

21 testimonial). Similarly, the victim told Ms. Bishop about his problems with the Petitioner

22 "[a]ny time he came from work and he was on the same shift with that person." Ans., Ex.

23 B at 1002:10-12. This appears to be normal griping to a partner about an irritating

24 coworker, rather than an attempt "to invoke the coercive machinery of the State." <u>Bryant</u>,

25 562 U.S. at 381. Likewise, the victim "mentioned [] a few times" to his brother, Mr.

26 Lewis, that "he was having an issue with a guy at work," "basically about a girl." Ans.,

27 Ex. B at 1012:23-1013:11. There is no indication that the victim intended a conversation

28

with his brother to be testimonial.  <u>See Williams</u>, 447 F. App'x at 831 (statements made to family are non-testimonial); <u>see also Schubert</u>, 605 F. App'x 688 (finding that statements to a family friend were non-testimonial).  Viewed objectively, the circumstances surrounding these conversations make clear that the victim was speaking with friends and family in an ordinary fashion, not attempting to create a record with law enforcement.

Accordingly, the victim's statements to friends, his girlfriend, and his family were not testimonial in nature.  Because these statements were not testimonial, the Confrontation Clause does not apply.

Finally, even if the Confrontation Clause applied to any of the statements at issue, Confrontation Clause claims are still subject to harmless error analysis.  <u>United States v. Nielsen</u>, 371 F.3d 574, 581 (9th Cir. 2004); <u>see also United States v. Allen</u>, 425 F.3d 1231, 1235 (9th Cir. 2005).  For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the statement had an actual and prejudicial effect upon the jury.  <u>See Hernandez v. Small</u>, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing <u>Brecht</u>, 507 U.S. at 637 (1993)).  Here, as the state appellate court found, "the evidence supporting [Petitioner's] guilt was strong."  <u>Williams</u>, 2017 WL 6334240, at *9.  As noted above, three eyewitnesses saw the murder and testified that Petitioner did not act in self-defense, <u>see</u> Ans. at 14 (citing record), the autopsy suggested that the victim's wounds were defensive, <u>see id</u>. (same), and Petitioner sustained no injuries, <u>see id</u>. (same).  Considering this "strong" evidence of Petitioner's guilt, any error in admitting the victim's out-of-court statements would have been harmless.

Because the victim's challenged statements were non-testimonial, and in any event their admission was harmless, Petitioner is not is not entitled to relief on his Confrontation Clause claim.  Accordingly, Petitioner's sixth claim is DENIED.

### c.  Claim 7 fails because Petitioner's due process was not violated.

Petitioner's seventh claim is that the admission of the victim's out-of-court statements violated his right to due process because it allowed the jury to consider

30

"improper bad character evidence."  Pet., Ex. A at 36 ("[Admission of the hearsay] also

was improper bad character evidence in violation of the due process clause of the 5th and

14th Amendments.").  Petitioner does not specify what evidence of his "bad character"

was put before the jury.  See generally, Pet., Ex. A.

In any event, habeas relief is not warranted here because no remediable federal

constitutional violation occurred.  First, a petitioner's due process rights concerning the

admission of propensity evidence is not clearly established for purposes of review under

AEDPA, the Supreme Court having reserved this issue as an "open question."  Alberni v.

McDaniel, 458 F.3d 860, 866–67 (9th Cir. 2006); accord Mejia v. Garcia, 534 F.3d 1036,

1046 (9th Cir. 2008) (reaffirming Alberni).  Second, the Supreme Court "has not yet made

a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due

process violation sufficient to warrant issuance of the writ."  Holley v. Yarborough, 568

F.3d 1091, 1101 (9th Cir. 2009).  Third, any claim that the state court erred in admitting

the evidence under state law is not remediable on federal habeas review.  See Bradshaw v.

Richey, 546 U.S. 74, 76 (2005).

Finally, even if the admission of the victim's statements was an error of

constitutional dimension – which it is not – the Court must consider whether the error had

a "substantial and injurious effect or influence in determining the jury's verdict."

Brecht, 507 U.S. at 637.  In this case, as repeatedly discussed above, there was "strong"

evidence of Petitioner's guilt, showing that Petitioner did not act in self-defense.  Any

error in admitting the victim's statements did not have a "substantial and injurious effect"

on the verdict.  See Dillard, 244 F.3d at 769–70, amended on denial of reh'g (May 17,

2001) ("Even if we assume, without deciding, that the trial court [committed constitutional

error], that ruling could not have had a 'substantial and injurious effect or influence in

determining the jury's verdict.' . . .  There was an abundance of other, uncontradicted

evidence that Dillard had suffered the convictions alleged.") (citations omitted.

Accordingly, Petitioner's seventh claim is DENIED.

United States District Court
Northern District of California

**4.** **Cumulative Error Claim**

As his eighth claim, Petitioner argues the cumulative effect of the constitutional errors violated his right to a fair trial. Pet., Ex. A at 37. In some cases, although no single error warrants reversal, the cumulative effect of several errors may prejudice a defendant so much that his conviction must be overturned. Alcala v. Woodford, 334 F.3d 862, 893–95 (9th Cir. 2003). However, where there is no constitutional error existing, nothing can accumulate to the level of a constitutional violation. Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011). Similarly, there can be no cumulative error if there has not been more than one error. United States v. Solorio, 669 F.3d 943, 956 (9th Cir. 2012).

Here, there were no constitutional errors and, therefore, nothing can accumulate to the level of a constitutional violation.

## IV. CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**. See Rule 11(a) of the Rules Governing Section 2254 Cases. Petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure. See Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

**IT IS SO ORDERED**.

Dated: _4/2/2020_

EDWARD J. DAVILA
United States District Judge

Order Denying Petition for Writ of Habeas Corpus; Denying COA
P:\PRO-SE\EJD\HC.18\04859Williams_den-habeas.docx